# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MISTIA L. MILLS,                                    Case No. 1:11-cv-321
      Plaintiff                                 Dlott, J.
                                                    Litkovitz, M.J.

    vs


COMMISSIONER OF                                     **REPORT AND**
SOCIAL SECURITY,                                    **RECOMMENDATION**
    Defendant


Plaintiff brings this action pro se pursuant to 42 U.S.C. § 405(g) for judicial review of the

final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's

applications for disability insurance benefits (DIB) and supplemental security income (SSI).

This matter is before the Court on plaintiff's Statement of Errors (Doc. 7), the Commissioner's

response in opposition (Doc. 8), and plaintiff's Notice of Filing of Supplemental Authority (Doc.

9).

## I.  Procedural Background

Plaintiff filed applications for DIB and SSI on October 16, 2007, alleging disability since

October 15, 2005, due to poor eyesight, plates and screws in her left leg, asthma, emphysema,

depression and curved spine.   Plaintiff's applications were denied initially and upon

reconsideration.   Plaintiff, through counsel, requested and was granted a de novo hearing before

Administrative Law Judge (ALJ) Christopher B. McNeil.   Plaintiff, a vocational expert (VE),

and a medical expert (ME) appeared and testified at the ALJ hearing.   On March 11, 2010, the

ALJ issued a decision denying plaintiff's DIB and SSI applications.   Plaintiff's request for

review by the Appeals Council was denied, making the decision of the ALJ the final

administrative decision of the Commissioner.

## II. Medical Evidence[1]

Plaintiff sustained a left lateral condylar tibia plateau fracture in May 2006. (Tr. 371).
She failed to appear for the initially scheduled surgery, and Dr. Michael Archdeacon, M.D.,
subsequently performed an open reduction and internal fixation of the left tibial plateau on June
23, 2006. (Tr. 344, 350). When Dr. Archdeacon examined plaintiff in September 2006, she
was doing moderately well, she was complaining of mild to moderate pain, she was walking with
a cane and using a hinged brace, and she was improving weekly. (Tr. 363). She was in no
acute distress. She had an obvious antalgic gait in the left lower extremity. She had mild pain
over the lateral tibial plateau with palpation. Range of motion was from 5 to 120 degrees in the
flexion extension arc. The skin showed a fully healed lateral incision of the proximal tibia.
X-rays showed what appeared to be a consolidated highly comminuted left lateral tibial plateau
fracture with maintenance of the joint space. There was no evidence of posttraumatic
arthropathy and the hardware was intact. The plan was for plaintiff to continue activities as
directed and add activities, including weightbearing, as tolerated. Physical therapy and pain
medication were discussed and prescriptions were distributed. Plaintiff was to return in three
months with x-rays to be obtained at that time. She was to call with any questions.

Dr. Jennifer Bailey, M.D., performed a consultative examination in January 2008. (Tr.
396-404). Plaintiff complained of unrelenting chronic left knee pain, which had increased in
severity since the surgery. Plaintiff complained that her leg constantly felt cold and that sitting,
standing and walking aggravated the knee. She had not had recent physical therapy and had not

---

[1]Plaintiff does not raise any errors relating to her mental impairments. The Court therefore has summarized the
evidence pertaining only to plaintiff's physical impairments.

2

been back to see her surgeon; she was not seeing a physician; and she was not taking any medication.   She reported using a heating pad.   Plaintiff complained of occasional left knee instability and stated she had fallen in the past.   Plaintiff stated she did not use an ambulatory aid and she had last used a knee brace six to eight months earlier.   Plaintiff reported she had suffered from asthma all of her life and dyspnea had increased in severity over the last five years, but she was using no inhalers and continued to smoke a pack of cigarettes a day after having recently cut back from two packs a day.   She had never visited an emergency room or been hospitalized for respiratory problems.   Plaintiff reported she could not walk more than 500 feet on level terrain without shortness of breath, and this symptom increased upon climbing stairs or walking up grades.   She was unable to perform housework or shopping without associated dyspnea.

Dr. Bailey described plaintiff as obese at 5'4" tall, 175 pounds.   Dr. Bailey observed that plaintiff ambulated with a limping gait and was uncomfortable in both the sitting and supine positions.   Plaintiff had a mildly prolonged expiratory phase and expiratory wheezes and bronchi in all fields, and there were no rales or evidence of cyanosis.   Plaintiff complained of neck pain radiating down into the back, but there was no evidence of muscle spasms and range of motion of the cervical spine was normal except for extension, which was diminished to 30 degrees.   She could not squat.   On neurological examination, there was no evidence of muscle weakness or atrophy and all sensory modalities were well-preserved, including light touch and pinprick.   All deep tendon reflexes were brisk bilaterally.   Flexion and extension of the right knee was normal but was diminished in the left knee.   There was a large effusion over the left knee.   There was no evidence of crepitus or ligamentous laxity in either knee, and no significant side-to-side

3

variation in laxity. Medial and lateral stress testing revealed no joint line opening and there did

not appear to be rotary instability. An x-ray showed post-traumatic degenerative arthritis of the

left knee joint on the lateral aspect with depression of the lateral plateau of the tibia from a

fracture that was well-healed. The diagnoses included chronic left leg/knee pain, shortness of

breath with ongoing heavy tobacco use and evidence of active bronchitis, exogenous obesity, and

diminished visual acuity in the right eye. Dr. Bailey noted a knee brace would probably help,

weight reduction would diminish plaintiff's complaints, and it would be beneficial for plaintiff to

stop smoking.

Dr. Bailey opined that plaintiff appeared capable of performing at least a mild amount of

ambulating, standing, bending, pushing, pulling, lifting and carrying heavy objects; she is unable

to kneel; she has no difficulty sitting, reaching, grasping, and handling objects; and she would do

best in a dust-free environment.

Plaintiff presented at the Price Hill Clinic in April 2008 to establish primary care for

management of her asthma and chronic knee pain. (Tr. 406). She had not been on any

medications for one year. (Tr. 406). The examining physician reported some puffiness and

tenderness to the slightest palpation. (Tr. 407). A notation was made that an orthopedic

referral would be obtained for plaintiff, and plaintiff was to call for a lab appointment. (Tr.

408). Plaintiff did not show for a scheduled appointment on May 21, 2008. (*Id.*). Plaintiff

was next seen at the clinic on August 21, 2008, complaining of severe left leg pain and seeking

refills of her medications. (Tr. 439). She was diagnosed with asthma and chronic knee pain.

The plan was to refill her medications, and a notation was made about a referral to an

orthopedist. (Tr. 439-40). The office notes also indicate that plaintiff reported she was still

4

smoking one-half pack of cigarettes a day and she usually used a cane but it was broken.   There is a notation dated August 28, 2008, that plaintiff had an iron deficiency and iron shots should be considered for the next visit, (Tr. 439), but there are no notes for any additional visits.

State agency physician Dr. Gary Demuth, M.D., reviewed the record and completed a physical residual functional capacity (RFC) assessment on January 1, 2008.   (Tr. 429-437).   He opined that plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; never climb ladders/ropes/scaffolds; and occasionally kneel, crouch and crawl.   Her far acuity was limited and she should avoid concentrated exposure to fumes, odors, dust and gases and all exposure to hazards based on bronchitis and vision issues.   Dr. Demuth noted in support of his restrictions that plaintiff was not receiving treatment at the time of his examination, she was not using ambulatory aids, her knee joint was stable, and she continued to smoke.   (Tr. 431).   He found that plaintiff was not fully credible because she alleged pulmonary symptoms but continued to smoke, and she was receiving no current treatment.   (Tr. 435). Based on a review of the evidence of record, state agency physician Dr. Teresita Cruz, M.D., affirmed Dr. Demuth's assessment as written on August 12, 2008.   (Tr. 428).

Dr. Chuc Le, M.D., an orthopedist, performed a consultative examination in December 2009.   (Tr. 441-453).   Plaintiff complained of constant pain in the left knee.   She stated she was unable to put pressure on the knee; she complained of a constant burning sensation around the left knee; and she stated she was unable to walk up or down hills.   She was taking no medication and was smoking one-half pack of cigarettes a day.   Her blood pressure was 142/74, she was 62.5" tall, and her weight was 150 pounds.   She appeared to be in some distress with

5

pain in her left leg.   Plaintiff had moderate tenderness upon palpation of the patella and the

medial and lateral of the left knee; mild tenderness on palpation of the tibia; and weakness with

flexing or extending the left leg.   Circumferential measurements of the calves were equal.

Circumferential measurements of the thighs were 44.5 cm on the left and 43.5 cm on the right.

Flexion of the left knee was to 90 degrees and extension was to +20 degrees.   Achilles reflexes

were +2/4 equal bilaterally.   Plaintiff had an abnormal gait and stance and walked with a limp.

She was unable to walk on toes or heels, and she was unable to squat.   Sensation was intact in

the lower extremities.

Dr. Le opined that plaintiff has the following limitations of the left leg:   She is unable to

stand more than five minutes, she is unable to walk more than 40 feet, and she is unable to lift

more than 10 pounds.   (Tr. 442).

Dr. Le completed a Statement of Ability to do Work-Related Activities.   (Tr. 447).   He

opined that plaintiff can frequently lift up to 10 pounds; she can sit for 8 hours, stand for 5

minutes, and walk for 5 minutes at a time without interruption; she can sit for 8 hours, stand for 2

hours, and walk for 1 hour in an 8-hour workday; she does not require the use of a cane to

ambulate; she can never push/pull with the left foot; she can never climb stairs, ramps, ladders or

scaffolds; she can never kneel, crouch or crawl; she can occasionally balance and stoop; she can

never be exposed to unprotected heights, moving mechanical parts or vibrations and can never

operate a motor vehicle; she can occasionally be exposed to humidity and wetness, dust, odors,

fumes and pulmonary irritants, and extreme temperatures; and she can be exposed to moderate

noise.   (Tr. 447-451).   Dr. Le opined that plaintiff cannot perform activities like shopping; she

cannot walk a block at a reasonable pace on rough or uneven surfaces; and she cannot use

6

standard public transportation.  (Tr. 452).  Dr. Le concluded that plaintiff's limitations would

last for 12 consecutive months.  (*Id.*).

## III.  Analysis

### A.  Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable

physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A)

(DIB), 1382c(a)(3)(A) (SSI).  The impairment must render the claimant unable to engage in the

work previously performed or in any other substantial gainful employment that exists in the

national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation

process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541,

548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The claimant [met] the insured status requirements of the Social Security Act
> through December 31, 2010.
>
> 2. The claimant has not engaged in substantial gainful activity since October 15,
> 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: obesity, arthritis,
> degenerative joint disease, diminished right eye visual acuity, asthma, a
> depressive disorder, and a somatoform disorder (20 CFR 404.1520(c) and
> 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that
> meets or medically equals one of the listed impairments in 20 CFR Part 404,
> Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d),
> 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that the
> claimant has the residual functional capacity [RFC] to perform light work as
> defined in 20 CFR 404.1567(b) and 416.967(b) except that she can lift not more
> than 20 pounds occasionally. She can lift not more than 10 pounds frequently.
> She can push or pull not more than 10 pounds using hand or foot controls. She
> can sit, stand, or walk not more than six hours each in an eight-hour workday.
> She cannot use ladders, ropes, or scaffolds. She can use ramps and stairs not
> more than frequently. She can balance or stoop not more than frequently. She

8

can kneel, crouch, or crawl not more than occasionally. Any work she could perform cannot require more than occasional far visual acuity. The work must not have concentrated exposure to fumes, odors, dusts, gases, or poor ventilation. There can be no exposure to heights or dangerous machinery. She is capable of completing simple, repetitive tasks that do not require more than superficial interaction with the general public and do not require strict adherence to production standards or schedules.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

7. The claimant was born [in] . . . 1967, and was 38 years old, which is defined as a "younger individual" age 18-49 on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2005, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-21).

---

[2]Plaintiff's past relevant work was as a retail clerk, mail sorter, and general laborer. (Tr. 19).

[3]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the light unskilled jobs of packer, with 700 such jobs in the local economy and 180,000 jobs in the national economy; cleaner, with 200 jobs in the local economy and 125,000 jobs in the national economy; and utility worker, with 450 jobs in the local economy and 200,000 jobs in the national economy; and the sedentary unskilled jobs of inspector, with 500 such jobs in the local economy and 100,000 jobs in the national economy, and hand packer, with 800 jobs in the local economy and 130,000 jobs in the national economy. (Tr. 20-21).

### C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,*

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*,

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B*., 305 U.S. 197, 229

(1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination.  Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right."  *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

### D.  Specific Errors

On appeal, plaintiff argues that: (1) the ALJ erred by failing to find plaintiff's

impairments met or equaled the requirements of Listing 1.02(A), 20 C.F.R. Subpart P, Appendix

1, § 1.00(B)(2)(b)(2), and (2) the ALJ's credibility determination is not supported by substantial

10

evidence.

**1. The ALJ did not err by failing to find plaintiff's impairments meet or equal the Listings.**

Plaintiff contends that the ALJ failed to properly evaluate her knee impairment under

Listing 1.02(A).   An impairment meets Listing 1.02(A) if it satisfies the following criteria:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b. . . .

Section 1.00(B)(2)(b) of the Listings defines the "inability to ambulate effectively" as follows:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

That section also explains the meaning of "to ambulate effectively" as follows:

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.   The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

11

An impairment is medically equivalent to Listing 1.02(A) if it is "at least equal in severity and duration to the criteria" of the Listing. *See* 20 C.F.R. § 404.1526(a). Medical equivalence can be found in a number of ways as set forth in the regulations. 20 C.F.R. § 404.1526(b). The ALJ must consider medical equivalence based on all evidence in the record about the claimant's impairments and its effects that is relevant to the equivalency findings. 20 C.F.R. §§ 404.1526(b)(4), 404.1529(d)(3). The ALJ will consider whether the claimant's "symptoms, signs and laboratory findings are at least equal in severity to the listed criteria [but] will not substitute [the claimant's] allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of [the] impairment(s) to that of a listed impairment." 20 C.F.R. § 404.1529(d)(3). If the symptoms, signs and laboratory findings of the claimant's impairments are equivalent in severity to a listed impairment, the claimant will be found disabled. *Id.* Otherwise, the impact of the claimant's symptoms on the RFC will be considered. *Id.*

The ALJ is responsible for deciding medical equivalence in cases at the ALJ hearing level. 20 C.F.R. § 404.1526(e). *See also* SSR 96-6p, 1996 WL 374180, at *3. As the trier of fact, the ALJ is not bound by a finding of a state agency medical consultant or program physician as to equivalence, although the opinion of any physician designated by the Commissioner on the issue of equivalence must be received into the record as expert opinion evidence and given appropriate weight. SSR 96-6p, 1996 WL 374180, at *3. The ALJ has the discretion to "ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment" in

the Listing. *See Simpson v. Commissioner of Social Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009)

(citing *Davis v. Chater*, No. 95-2235, 1996 WL 732298, at *6 (6th Cir. Dec. 19, 1996) (former

20 C.F.R. §§ 404.1527(f)(2)(iii) and 416.927(f)(2)(iii) give the ALJ discretion whether to call a

medical expert)).[2]   The ALJ must call on a medical expert to give an updated medical opinion as

to equivalence in two circumstances: (1) when no additional medical evidence is received, but in

the opinion of the ALJ the symptoms, signs, and laboratory findings in the record suggest that a

judgment of equivalence may be reasonable; or (2) when additional medical evidence is received

that in the opinion of the ALJ may change the state agency medical consultant's finding that the

impairment is not equivalent in severity to the listed impairment.   SSR 96-6p, 1996 WL 374180,

at *4.   SSR 96-6p thus requires the ALJ to obtain an updated medical opinion "*only* when the

ALJ believes the evidence could change a medical consultant's finding that the impairment is not

equivalent to a listed impairment." *Courter v. Commissioner of Social Sec.*, No. 10-6119, 2012

WL 1592750, at *9 (6th Cir. May 7, 2012) (citation omitted).

Here, the ALJ determined that plaintiff's degenerative joint disease and arthritis did not

meet or equal Listing 1.02(A).   The ALJ found that those impairments caused some difficulty

with ambulation but did not result in an "inability to ambulate effectively" to an extent that

satisfied the criteria of Listing 1.02(A).   (Tr. 16).   The ALJ relied on the fact that plaintiff was

taking no medication when Dr. Bailey and Dr. Le performed their consultative examinations in

January 2008 and December 2009.   (Tr. 16, citing Tr. 396-404, 441-453).   The ALJ also noted

that plaintiff reported to Dr. Bailey in January 2008 that she had not had any recent physical

therapy; she had not been back to see her surgeon; she was not seeing a physician; she did not use

---

[2]Title 20 C.F.R. §§ 416.927 and 404.1527 were amended effective March 26, 2012, and §§ 416.927(f)(2)(iii) and 404.1527(f)(2)(iii) were redesignated as §§ 416.927(e)(2)(iii) and 404.1527(e)(2)(iii).

ambulatory aids; and she had last used a knee brace six to eight months earlier. (*Id.*, citing Tr. 396). The ALJ found these behaviors were not "those of an individual with knee problems that are of listing-level severity." (Tr. 16). The ALJ also found that no medical source had stated that plaintiff's impairments are of sufficient severity to medically equal a listed impairment. (*Id.*).

Plaintiff contends that the ALJ committed a number of errors in evaluating whether her impairment meets or equals the Listing, and the specific reasons he gave for finding her impairment does not meet or equal Listing 1.02(A) are erroneous. Plaintiff alleges that the ALJ erroneously indicated she required the use of a cane to meet or equal Listing 1.02(A); erroneously failed to note she had used a cane without resolution of her knee pain; and failed to specifically comment on the 1.00(B)(2)(b)(2) criteria. (Doc. 7 at 6-7, citing Tr. 363). Plaintiff further alleges that the ALJ failed to comment on the findings of Dr. Le, the consultative orthopedic examiner, when deciding her knee impairment does not meet the criteria of the Listing. (*Id.* at 6). Plaintiff contends this was error because Dr. Le's findings show she is unable to shop, use public transportation, or walk a block at a reasonable pace on rough or uneven surfaces and she therefore meets or equals the requirement of "inability to ambulate effectively" as defined under 1.00(B)(2)(b)(2). (*Id.* at 5-7, citing *Moss v. Commissioner*, 555 F.3d 556, 562 (7th Cir. 2009) (regulations provide a nonexhaustive list of examples of ineffective ambulation, such as the inability to walk without the use of a walker or two crutches or two canes; the inability to walk a block at a reasonable pace on rough or uneven surfaces; the inability to carry out routine ambulatory activities, like shopping and banking; and the inability to climb a few steps at a reasonable pace with the use of a single handrail); *Dobson v. Astrue,* 267 F. App'x 610, 611-612

14

(9th Cir. 2008) ("while the required use of a two-handed assistive device is *independently sufficient* to establish ineffective ambulation, ineffective ambulation may also be established if the claimant otherwise meets the definition and examples set forth in the Listing, [including] the inability to walk a block at a reasonable pace on rough or uneven surfaces, . . . the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.") (emphasis in original)).

Plaintiff further contends that the ALJ erred by failing to consider that she was unable to afford treatment for her impairments. (*Id.* at 7-8). Finally, plaintiff contends that the ALJ erred by failing to elicit the testimony of an orthopedic medical expert as to whether her knee impairment meets or equals the Listing and by relying on the evidence of record. (*Id.* at 7).

A review of the record shows that the ALJ's determination that plaintiff's knee impairment does not meet or equal Listing 1.02(A) finds substantial support in the record. There is no evidence plaintiff has "an extreme limitation of the ability to walk" as defined under 1.00(B)(2)(b)(1) as she does not require the use "of a hand-held assistive device(s) that limits the functioning of both upper extremities."

Moreover, the ALJ did not err by failing to find plaintiff's impairment is of sufficient severity to come within the scope of 1.00B(2)(b)(2). The ALJ reasonably relied on plaintiff's failure to pursue medical treatment to find that her knee impairment is not of listing-level severity. The ALJ noted that plaintiff was taking no medications when she was examined in January 2008 and December 2009. (Tr. 16, 18, citing Tr. 396-404, 441-453). The ALJ also noted that although plaintiff had a knee brace, she reported at the consultative examination in January 2008 that she had last used it six to eight months earlier. (Tr. 16, citing Tr. 396). The

15

ALJ also found that plaintiff did not use ambulatory aids (*Id.*), and in fact there is no indication in the record that a cane was ever prescribed for plaintiff or that she was ever observed using a cane except shortly following her surgery.

Furthermore, with the exception of a handful of doctor's visits, plaintiff failed to pursue treatment from any medical source for her knee impairment following her surgery. There is no evidence in the record to show that plaintiff returned to see her surgeon in December 2006 for a post-surgery follow-up as suggested. (Tr. 363). Moreover, when Dr. Bailey performed her consultative examination in January 2008, plaintiff reported that despite experiencing chronic pain since her surgery, she had not had recent physical therapy, she had not been back to see her surgeon, and she was not seeing a physician. (Tr. 396). In fact, according to the record, plaintiff sought treatment for knee pain only two or three times following her surgery at the Price Hill Clinic in April and August 2008 (Tr. 405-08, 438-40), and she failed to show for an appointment on May 21, 2008. (Tr. 408). Although there are notations in the August 2008 clinic notes about plans to obtain an orthopedic referral and to consider iron injections at plaintiff's next visit (Tr. 439), there is no indication in the record that plaintiff ever pursued a referral or that she returned to the clinic after the August 2008 visit. The ALJ reasonably concluded that plaintiff's failure to seek treatment indicated her impairment was not of listing-level severity. (Tr. 16).

Plaintiff contends that the ALJ nonetheless erred by taking into account her failure to seek treatment in assessing the severity of her impairments because the ALJ did not consider that she was unable to afford treatment. (Doc. 7 at 7-8). The Social Security regulations caution that the ALJ "must not draw any inferences about an individual's symptoms and their functional

16

effects from a failure to seek or pursue regular medical treatment without first considering any

explanations that the individual may provide, or other information in the case record, that may

explain infrequent or irregular medical visits or failure to seek medical treatment. . . ."  *Stennett*

*v. Commissioner of Social Sec.*, 476 F. Supp.2d 665, 673 (E.D. Mich. 2007) (citing SSR 96-7p).

Here, however, the ALJ did consider plaintiff's alleged inability to afford treatment.  The ALJ

found that although plaintiff testified she takes no medications because she cannot afford them,

there is nothing in the file that indicates she tried to obtain medication at little or no cost.  (Tr.

18-19).  Nor has plaintiff pointed to any such evidence in the record.  Furthermore, as discussed

below in connection with the ALJ's credibility finding, it was reasonable for the ALJ to consider

plaintiff's failure to seek treatment in assessing the severity of her impairments, despite her

alleged inability to pay, given that plaintiff continued to smoke from one-half to two packs of

cigarettes a day throughout the period of her alleged disability.  (Tr. 58, 359, 396, 441).  Thus,

the ALJ did not err by taking plaintiff's failure to seek treatment into account when assessing the

severity of her knee impairment.

　　　　Plaintiff further contends that the ALJ could not properly rely on the Disability

Determination and Transmittal forms completed by state agency medical consultants to find she

did not meet the Listing because those forms do not specifically mention or discuss Listing

1.02(A), and the only such form completed following Dr. Le's examination is not signed by a

doctor.  (Doc. 7 at 7, citing Tr. 80-88).  Plaintiff has not shown that the ALJ erred in this regard

as the ALJ's decision does not indicate that he relied on these forms.  Rather, the ALJ's decision

shows that he properly relied on assessments completed by the consultative examining physicians

and the state agency reviewing physicians.  The ALJ stated that he gave "great weight" to the

17

assessment of consultative examining physician Dr. Bailey and "some weight" to the assessment

of state agency reviewing physician Dr. Demuth as affirmed by Dr. Cruz, and the assessment of

consultative examining physician Dr. Le.[3]   (Tr. 19, citing Tr. 399, 428-437, 448).   The ALJ

explained his reasons for determining the weight he decided to give these opinions.   (Tr. 19).

The ALJ was entitled to credit the opinions of Dr. Bailey and the state agency medical

consultants who reviewed the record and to rely on these opinions to find plaintiff's knee

impairment did not meet or equal the Listings.   (Tr. 16, 19).   *See* 20 C.F.R. §§

404.1527(e)(2)(i), 416.927(e)(2)(i) (ALJ must consider findings and opinions of state agency

medical consultants as opinion evidence).   Because the opinions of Dr. Bailey and the state

agency reviewing physicians provide substantial support for the ALJ's finding that plaintiff's

knee impairment is not of listing-level severity, the Court must defer to the ALJ's decision, even

if Dr. Le's opinion supports the opposite conclusion.   *Foster v. Halter*, 279 F.3d 348, 353 (6th

Cir. 2001) (if ALJ's decision is supported by substantial evidence, court must defer to the

decision even if there is substantial evidence that would support an opposite conclusion).

　　　　Plaintiff further contends that the ALJ erred by failing to obtain additional testimony from

an orthopedic medical advisor as to whether her knee impairment meets or equals Listing

1.02(A).   (Doc. 7 at 5, 7, citing SSR 96-6p, 1996 WL 374180; 20 C.F.R. § 404.1526 note).

Plaintiff suggests that the ALJ was required to obtain an updated medical opinion because the

state agency medical consultants did not review Dr. Le's examination results and her knee

condition deteriorated following the issuance of their reports.   However, the record does not

include evidence of symptoms, signs, or laboratory findings indicating plaintiff's condition

---

[3]The ALJ rejected Dr. Le's opinion insofar as Dr. Le found that plaintiff was limited to sitting for eight hours,
standing for two hours and walking for one hour.   (Tr. 19).

worsened between the time the medical consultants issued their opinions in January and August 2008 (Tr. 428-437) and December 2009 when Dr. Le issued his report. (Tr. 441-453). The ALJ therefore was not required to obtain an updated opinion on medical equivalence from a medical expert. SSR 96-6p, 1996 WL 374180, at *4.

Finally, plaintiff claims that the ALJ erred when he found that her impairments in combination, including "the obesity and depression and pain disorder," do not equal Listing 1.02(A). (*Id.* at 5, 8). Plaintiff has pointed to no evidence in the record to show that these impairments, in combination with her knee impairment, equal an impairment in the Listing. Plaintiff's general allegation fails to show the ALJ erred in this respect.

The ALJ set forth specific reasons why plaintiff's knee impairment does not meet or equal Listing 1.02(A). The ALJ's reasons find substantial support in the record. Given the paucity of treatment notes and objective findings documenting plaintiff's symptoms, the ALJ was not obligated to call upon an orthopedic medical expert to provide additional testimony. For these reasons, plaintiff's first assignment of error should not be sustained.

## 2. The ALJ's credibility finding is supported by substantial evidence.

Plaintiff contends that the ALJ erred in evaluating her credibility. (Doc. 7 at 8-11). Specifically, plaintiff alleges that the ALJ erroneously discounted her credibility based on her "grocery shopping, watching television, and not receiving medical treatment." (*Id.* at 9). Plaintiff alleges that her subjective complaints show she is unable to perform even sedentary work. (*Id.* at 11). Plaintiff further contends that the ALJ erred by failing to take into account her inability to afford medical treatment when assessing her credibility and to consider whether her impairments would be remediable with treatment. (*Id.* at 9-10, citing 20 C.F.R. §§

19

404.1529, 404.1530; SSR 82-59, SSR 96-7p; *Stennett*, 476 F. Supp.2d at 672; Tr. 52-53, 57, 58).

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984)).

Social Security Regulation 96-7p describes the requirements by which the ALJ must abide in rendering a credibility determination:

> It is not sufficient for the adjudicator to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

(emphasis added). The ALJ's credibility decision must also include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other

20

than treatment the individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p.

Here, the ALJ properly assessed plaintiff's credibility in light of the above requirements. A review of the ALJ's decision shows the ALJ considered a number of factors in determining that plaintiff's credibility was "poor." (Tr. 18). First, as to her physical impairments, the ALJ relied on inconsistencies between plaintiff's allegations and her reports of activities of daily living in the record. (*Id.*). The ALJ noted that although plaintiff alleged that she cannot stand for long and that she does not grocery shop, she reported in December 2007 that she does go to the grocery store and that it takes her about two hours to shop. (Tr. 240-241). The ALJ also noted that although plaintiff testified at the ALJ hearing that she is unable to watch a complete television show because she watches approximately ten minutes before she has to get up and move around and then come back (Tr. 59), plaintiff reported elsewhere that she sat and watched television "all the time" and from the time she got up until the time she went to bed. (Tr. 201, 204). The ALJ was entitled to rely on these inconsistencies he identified in plaintiff's statements about her daily activities to find that plaintiff was not entirely credible.

Second, the ALJ reasonably relied on plaintiff's failure to receive medical treatment for her allegedly disabling impairments over the course of several years to discount her credibility. (Tr. 18). The ALJ noted that plaintiff was not taking any medication when she filed her application (Tr. 234) and when she was examined by the consultative examining psychologist and physicians in December 2007 (Tr. 389); January 2008 (Tr. 397); and December 2009 (Tr. 441). In addition, the ALJ noted that plaintiff stated in January 2008 that she had last used a

knee brace six to eight months earlier, which was not consistent with allegations of a disabling knee impairment.  (Tr. 19, citing 396).   The ALJ further determined that plaintiff's continued use of cigarettes in the face of her asthma condition, for which she took no medication, weighed against her credibility.  (Tr. 19).   *See Sias v. Secretary of Health and Human Services,* 861 F.2d 475, 480 (6th Cir. 1988) (lifestyle of overweight claimant, who had not worn support hose because of cost but who continued to smoke two packs of cigarettes a day, was not consistent with that of individual who suffers from intractable pain or believes condition could quickly become life threatening).

As to plaintiff's failure to seek treatment, the ALJ did not err by failing to take into consideration plaintiff's lack of financial resources in assessing her credibility.   The ALJ acknowledged plaintiff's testimony that she does not take medications because she cannot afford them, but the ALJ found nothing in the record to indicate that she had tried to obtain medication at little or no cost.  (Tr. 18-19).   The record supports the ALJ's finding in this regard.   While plaintiff testified at the ALJ hearing that she cannot afford medical care (Tr. 52-53, 57), plaintiff has not shown that she attempted to access free or subsidized medical services at a hospital or clinic and was denied such access.   In fact, the evidence shows that plaintiff was able to receive treatment at the Price Hill Clinic in April 2008, she failed to show for an appointment in May 2008, and she was treated again in August 2008.  (Tr. 405-08, 439-40).   Plaintiff was prescribed medications at the April and August 2008 visits, and she testified at the ALJ hearing that she would take pain medication and muscle relaxers if she could afford them.  (Tr. 57).   However, there is no indication in the record that plaintiff pursued further treatment at the clinic or that she was precluded from returning to the clinic or obtaining treatment elsewhere for financial reasons.

22

Furthermore, according to plaintiff's testimony and her statements to examining sources, she continued to smoke approximately one-half to two packs of cigarettes per day during the period she claims she was disabled. (Tr. 50, 359, 396, 441). The pursuit of such an expensive habit belies plaintiff's claim that she could not afford any type of treatment during the time period in question. *See Williams v. Astrue*, No. 2:09-cv-042, 2010 WL 503140, at *7 (E.D. Tenn. Feb. 8, 2010) (credibility concerns raised where claimant who testified he could not afford $3.00 respiratory medication smoked up to two packs of cigarettes per day) (*citing Sias*, 861 F.2d at 480). Thus, the ALJ properly took plaintiff's allegations concerning her alleged inability to pay for medical treatment into account when assessing her credibility.[4]

Finally, the ALJ did not err by failing to take into account the objective medical findings of Dr. Bailey and Dr. Le, and specifically Dr. Le's finding that she can only walk 40 feet, in assessing plaintiff's credibility. (Doc. 7 at 10, citing Tr. 442). Dr. Le concluded that plaintiff can walk five minutes at a time without interruption, which is clearly inconsistent with his conclusion that she can walk only 40 feet. (Tr. 448). Moreover, the ALJ's decision shows that he considered plaintiff's credibility in light of the objective medical findings. (Tr. 19).

The ALJ's decision clearly reflects that he properly considered the required factors in making his credibility determination and that his decision is substantially supported by the record. Plaintiff's second assignment of error should not be sustained.

---

[4]Plaintiff also alleges that the ALJ erred by failing to consider her lack of financial resources in the context of whether her impairments are remediable. (Doc. 7 at 9-10, citing 20 C.F.R. § 404.1530; SSR 82-59, 1982 WL 31384). However, plaintiff has not shown how § 404.1530 and SSR 82-59, which address a claimant's failure to follow prescribed treatment, have any applicability to her situation.

## CONCLUSION

The ALJ properly evaluated the evidence of record in determining that plaintiff does not meet or equal Listing 1.02(A).   The ALJ also thoroughly assessed plaintiff's credibility.   The record contains substantial evidence to support the ALJ's conclusion that plaintiff is able to perform a significant number of jobs that exist in the national economy and is therefore not disabled.   For these reasons, the ALJ's decision is supported by substantial evidence and should be affirmed.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED**.


Date: _5/14/2012_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

MISTIA LEAIA MILLS,                             Case No. 1:11-cv-321
     Plaintiff                                 Dlott, J.
                                                Litkovitz, M.J.

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant


**NOTICETO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to these proposed findings and recommendations within **FOURTEEN DAYS** after being served with this Report and Recommendation ("R&R"). That period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within **FOURTEEN DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).